## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>ROWLEY SOLAR LLC<br><br>Debtor | Chapter 11<br>Case No. 19-12419-FJB |

## REQUEST FOR FINDINGS OF FACT

Now comes Bonni Berkowitz, Barbara Berkowitz (collectively "Berkowitz") and Maven Revocable Trust ("Maven") (collectively the "Berkowitz Parties") and request that this Court make the following findings of fact in connection with the evidentiary hearing conducted on April 7 and April 8, 2021.[1]

The findings requested are as follows:

1.      Berkowitz owned and controlled Rowley Solar, LLC. ("Rowley")

2.      Berkowitz owned and controlled Maven.

3.      Berkowitz worked for about 10 years to put together a solar project for themselves to be erected on property owned by Maven.

4.      Toward that end, Berkowitz acquired for Rowley, and Interconnection Agreement ("IA") and a Power Purchase Agreement ("PPA") for Rowley to generate and sell electricity to the Town of Rowley through its Municipal Light Plant.  ("RMLP") [Exhibit 1] [19:2-11]

5.      With construction to be conducted on Maven's property, the Rowley Conservation Commission issued an Order of Conditions to Maven. [Exhibit 2] [34:13-22]

---

[1] All references to transcripts use the format page:line.  All references are to volume 1 (day 1) of the trial unless otherwise indicated.  All exhibits referenced are Berkowitz exhibits unless otherwise indicated.

6.     In December, 2018, Berkowitz negotiated with Invaleon Technologies Corporation ("ITC") for the terms of a Membership Interest Purchase Agreement, ("MIPA") which was executed by ITC and Rowley on December 14, 2018. [Exhibit 3] [38:15-40:15]

7.     ITC was selected because it was a local company appearing to be a good fit, which Berkowitz signed.  [Exhibit 3] [195:3-25]

8.     The MIPA was executed at the Haverhill, Massachusetts office of ITC on December 14, 2018. [58:14-23]

9.     Berkowitz arrived at the offices of ITC at about 1:30 – 2:00 pm for a closing, and not after regular business hours.  [194:4-10]

10.     No other documents were executed at that time, [198:2-3, 199:1-5] even though the MIPA contemplated the execution and delivery of other documents by both parties, as well as the payment of funds. [66:14-68:14]

11.     The MIPA was signed in the presence of Tom Wu, Tom Wu's wife, Bonni and Barbara.  No attorneys were present. [59:2-60:5]

12.     Tom Wu offered to pay Berkowitz $250,000 in cash at the closing, leaving Berkowitz with the thought of not signing. [196:18-197:8]  However, after discussion and a demonstration by Tom Wu, they decided to stay and sign. [197:9-24]

13.     The MIPA was executed by Tom Wu on behalf of ITC, and he is the person at ITC that is most knowledgeable about the dealings with Rowley. [58:2-13, 54:23-55:2]

14.     ITC accepted the terms of the MIPA, and with it, accepted the terms of the IA and the PPA, and acknowledged the obligation to comply with the Order

of Conditions, as ITC was aware of the terms of each document.  [Exhibits 1, 2] [55:8-57:16, 59:6-8, 199:20-25, 200:9-16]

15.    When ITC came on to the project, Tom Wu considered the existing agreements that were in place with the Town of Rowley to be quite valuable, and attractive to a buyer.  [Volume 2 39:20-40:6]  With a municipal buyer for the electricity, Tom Wu considered the project to be investment grade. [Volume 2 41:7-42:10]

16.    ITC, which had already commenced construction of the solar project, continued its work with the understanding that the financial benefits of the project required meeting certain time deadlines:

> a.  In order to receive Solar Renewable Energy Certificates, ("SREC") which had significant value, the project needed to reach mechanical completion by February 21, 2019. [70:23-71:2]

> b.  In order to receive eligibility for other benefits, the project had to receive permission to operate from RMLP by December, 2019. [68:4-9]

17.    Berkowitz had worked hard to get an extension of the mechanical completion date, as the SREC credits otherwise would have expred in December, 2018.  [211:18-212:7]

18.    Mechanical completion was achieved if the solar system is completely constructed and capable of producing its full power production. However, it's not connected to the power grid and permission to interconnect is not yet granted. [Exhibit 7, ¶17(a)] [69:4-70:10]

19.     The project was located on land owned by Maven, which also serves as the residence of Berkowitz, and the project is visible from the residence, which is about 300 yards from the residence.  [Exhibit 35] [190:5-191:22]

20.     The property had served as a family farm for many years, and had been used to raise livestock and vegetation.  [193:19-194:18]

21.     ITC hired subcontractors to undertake the construction of the project for clear cutting tress and excavation, including Soini Land Clearing. ("Soini") [Volume 2 42:24-43:10]

22.     Soini, as contractor for ITC, cut trees and removed topsoil from the property of Maven. [Volume 2 60:11-61:9] Soini removed about 12 acres of topsoil, which was not in compliance with the Order of Conditions. [Exhibits 2, 11] [28:19-31:15, 33:3-18]

23.     Soini also engaged in other activities not in compliance with the order of conditions, including utilizing hazardous materials on site and engaging in activities resulting in oil spillage.  [Exhibit 34] [33:24-34:8, 35:17-37:3]

24.     Soini, which was hired by ITC, was the responsibility of ITC.  Soini removed topsoil.  Tom Wu's denials of removal of trees and topsoil were false and misleading. [Volume 2 62:5-63:2]

25.     During the course of construction, ITC's activities were loud and disturbing to members of the community.  [Exhibit 4, 5] [201:9-202:20]

26.     ITC apparently determined that construction was complete, and prepared for issuance a Certificate of mechanical completion by an engineer. ("Certificate") by February 21, 2019. [Exhibit 19] [122:11-123:15]

27.     Once the Certificate issued on February 21, 2019, an additional $328,000 was due from ITC to Berkowitz, but was never paid. [66:7-10]

28.     On February 21, 2019, a representative of ITC sent an email to Richard Volkin ("Volkin"), a licensed Massachusetts engineer, asking him to sign off on a Certificate, as prepared by ITC on its letterhead. [Exhibit 19] [122:6-123:15]

29.     Volkin issued the Certificate as requested by ITC.  [Exhibit 19] [139:6-8]

30.     Volkin, however, never inspected the project for the purpose of issuing the Certificate.  This is based upon the evidence and his conflicting testimony:

    a.  He testified at trial that he inspected the project on February 19, 2019, as set forth in the Certificate, and he signed an affidavit stating that he inspected the project on February 19, 2021. [Exhibit 17] [138:10-140:2]

    b.  He signed a second affidavit that his statements in the Certificate were accurate and that he inspected the project on February 20, 2019. [Exhibit 18] [140:6-141:10]

    c.  In a deposition in this case, he testified that he viewed the project on February 20, 2019, [135:3-14, 135:19-136:5] and that he walked the perimeter of the solar fields because there was fencing in place at that time. [132:13-21, 141:11-143:18]

d. There was no fencing at the project in February 2019, nor was there any fencing in April 2019. [Exhibits 20, 21, 22, 23] [145:18-146:19, 207:9-210:4]

e. Volkin, an elderly man, testified that on February 20, 2019, he walked the project perimeter.  However, the project perimeter is in excess of a mile in distance, and has some significant grading to the site. [Volume 2 63:16-64:1] He could not have made this view in these conditions, which he stated involved black ice on that day. [135:24-136:15, 141:11-143:18]

f. Volkin's own calendar [Exhibit 16] [129:20-130:3, 134:2-20] did not reveal any appointment or visit to the project on February 19 or 20, nor did Volkin have any invoices issued to ITC for such a visit. [Exhibit 24] [146:20-148:8]

g. Volkin's billing records did not evidence any trip to the project site in the month of February 2019. [Exhibit 24] [146:20-148:8]

h. Volkin testified at trial that he went to inspect the project on February 20, 2019 in response to an email request for a final control document.  However, the email in question was not sent to him until February 21, 2019.  [Exhibit 19] [136:20-137:16]

31. Further, Volkin's credibility is suspect in any event.  He testified at trial that he had his professional engineer's license in New Hampshire suspended by agreement.  However, the State of New Hampshire suspended Volkin's professional license based upon allegations of misrepresenting his continuing

education compliance, which suspension was not by agreement.  [Exhibit 15] [126:22-127:12]

32.     Volkin testified that he first visited the project site in 2018 to kick the dirt, and that he was in Rowley to visit an old friend that he had not seen since the 1970s, but could not remember his friend's name or his friend's address. [128:8-129:9]

33.     After the issuance of the Certificate, ITC discovered that they did not yet have all of the documents contemplated by the MIPA. On February 25, 2019, without disclosing the issuance of the Certificate, ITC, by Tom Wu, its most knowledgeable person on the project, wrote to Berkowitz for the first time requesting these documents. [Exhibit 7, Bates 139] [213:3-17]

34.     Although ITC had the Certificate at this time, Tom Wu did not disclose this to Berkowitz, nor did he offer to pay the second payment that was due under the MIPA.  [Exhibit 7, Bates 139] [213:3-17, 213:21-214:2, Volume 2 69:15-25]

35.     During or about this time, Berkowitz had noticed numerous problems with the conduct of ITC on site, including but not limited to performing work outside the scope of permits, urinating near the residence, failure to maintain a porta-potty, improper tree removal, improper use of a dumpster without a cover,  [204:8-207:8, 210:22-211:10]

36.     The parties then engaged in dialog with numerous disputes amongst them, and the relationship deteriorated quickly.

37.     By email dated April 15, 2019, counsel for ITC indicated that ITC would go to the Registry of Deeds to deliver full payment under the MIPA in exchange for the documents requested.  [Exhibit 7, Bates 177] [45:1-14]

38.     However, according to counsel for Berkowitz, Berkowitz had not agreed to appear at the Registry of Deeds, as there were many issues to resolve concerning the conduct of ITC on the project. [44:21-45:14]

39.     ITC did show up at the Registry of Deeds, however, but not to pay funds to Berkowitz, but to file a document for the commencement of a fraudulent mechanic's lien notice of contract against property of Maven, which was recorded on April 16, 2019 and executed on April 15, 2019. [Exhibit 9] [88:6-17]

40.     The parties continued to negotiate, and at least one additional lien was placed against the property of Maven by a contractor of ITC on May 15, 2019. [Exhibit 10] [89:17-25]

41.     ITC managed to finance the project by not paying their vendors, including Consolidated Electric.  [90:5-18]

42.     On June 7, 2019, ITC commenced suit against Berkowitz in the Essex County Superior Court. The complaint ("Complaint") was verified by Tom Wu.  [Exhibits 7, 12] [42:8-19, 71:16-19]

43.     The Complaint sought damages of about $23 Million as well as all sorts of prejudgment relief, which terrorized Berkowitz. [219:10-19]

44.     Tom Wu knew that by his verification of the Complaint, he was advising the court that everything in the Complaint was true and accurate, and he was seeking to invoke the power of the court. [72:8-14, 75:14-17]

45.     The Complaint made false claims, statements and omissions in many material respects, including:

a.   The claim that the plaintiff was losing revenues on a daily basis commencing April 24, 2019 was false, as the project was not capable of earning any revenue until December 30, 2019. [Exhibit 7, page 1] [21:11-22:9, 79:5-80:1]

b.   The claim that Berkowitz showed up for the closing after normal business hours was false. [Exhibit 7, page 14] [98:22-99:11]

c.   The claim that after making the initial payment under the MIPA, nothing further was required to be fully vested with ownership of Rowley. [Exhibit 7, page1]  ITC still needed to comply with the MIPA itself, as well as the terms of the IA and the Order of Conditions. [78:18-79:4, Volume 2 70:6-20]

d.   The claim that Berkowitz was holding certificates hostage in exchange for ransom. [Exhibit 7, page1-2]   Tom Wu considered the amounts due to be paid Berkowitz under the MIPA to be ransom.  [76:1-15]

e.   The claims that ITC could not close out construction loans or interconnect to the town without membership certificates. [Exhibit 7, page 2]   ITC had no construction loans with institutional lenders. [81:17-25]   Further, ITC could not have obtained financing since it did not file tax

- 9 -

returns in the 10 years of its existence. Rather, ITC's own investors sought their own private financing and had obtained a commitment for financing.   [Exhibit 13] [118:14-122:3]

f.  The claim that since making the initial payment under the MIPA, that continuous demands and requests have been made for documentation from Berkowitz was false. [Exhibit 7, page 17]  The very first demand or request for documentation was two months after the initial payment was made. [72:14-75:13, 100:1-12]

g.  The complaint failed to disclose the deficiencies of ITC in compliance with the MIPA, the IA, or the Order of Conditions.  [19:17-20:3, 21:11-22:9, 23:10-24]  ITC had an obligation to comply with the Order of Conditions, and did not do so. [Volume 2 71:6-72:9]  ITC also had to comply with the IA, and it did not do so.  [Volume 2 72:10-72:22]

h.  The claim that a closing was arranged for April 16, 2019 at the Registry of Deeds to close out the MIPA, but that Berkowitz failed to appear.  [Exhibit 7, page 2]  In fact, Berkowitz had not agreed to such a meeting because a number of issues to resolve remained outstanding. [82:22-83:24, 44:21-45:14]  Further, Tom Wu did not go to the Registry of Deeds on April 16, 2019 to pay Berkowitz, rather he went there to record a fraudulent Notice of Contract on

behalf of an investor of ITC against the property of Maven.

[Exhibit 9] [88:6-23]

46.     During the course of the Superior Court lawsuit, the parties again engaged in discussions to resolve their differences, with the ITC's requests for injunctive and real estate attachment relief being postponed from time to time during the course of negotiations. [Exhibit 12] [40:19-41:20, 47:4-48:3]

47.     Berkowitz was concerned about the representations in the complaint that ITC was incurring damages of $23 million, and that the project was already connected and ready to operate. [219:10-19]

48.     On or about June 29, 2019, the parties reached an agreement to resolve their differences, all of which was evidenced by a Settlement Agreement ("Settlement") [Exhibit 6] and an MIPA Satisfaction Agreement. [Exhibit 26, exhibit 5 thereto] [47:4-48:3, 91:11-92:1]

49.     Berkowitz was assured that ITC would do all of the things in the Settlement and that they would be paid the monies due under the MIPA. [219:20-220:13]

50.     The settlement required ITC to undertake to clean up various issues pertaining to Maven's property within 7 days. [Exhibit 6 ¶1] [48:14-49:7, 92:2-5]

51.     The cleanup efforts by ITC were to have taken place and be substantially completed without commercially unreasonable delay. [Exhibit 6 ¶3] [47:22-49:7]

52.     Under the Settlement, ITC agreed to indemnify Maven and the Berkowitzes because the conduct of ITC on the project was created a financial burden and risk to Berkowitz and Maven. [94:11-20, 216:12-217:8]

53.     Liens on the property as a result of ITC's dealings were also placing Maven's property at risk, which was also the residence of Berkowitz.  [218:5-219:1]

54.     The Settlement was executed by Maven, and Maven reserved its rights with regard to claims of removal of topsoil from his property by ITC. [Exhibit 6 ¶16] [49:8-20, 94:21-95:1, 220:19-221:4]

55.     Not only did ITC not comply with the terms of the Settlement, ITC made things worse by utilizing materials on Maven's property that were not permitted by the Order Of Conditions.  As a result, on July 18, 2019, a no trespass order was issued by Maven and served upon ITC. [Exhibit 25] [108:11-24]

56.     After the Settlement, ITC did nothing to improve the project site as promised, but made things worse. [222:16-223:19]

57.     ITC never paid the $656,000 that it was to have paid under the Settlement or the MIPA Satisfaction Agreement.  [222:13-15]

58.     Through the process of negotiation and the Superior Court suit, Berkowitz learned about, amongst other things, that ITC had not paid amounts due and owing to the Town of Rowley or to RMLP.  [41:7-11]  With this concern, the IA and PPA were considered to be in jeopardy of being cancelled, which would render the project to be of no value whatsoever. [223:23-224:15]

59.     Prior to ITC's involvement, Berkowitz had spent 10 years to obtain the necessary Agreements with the Town of Rowley and spend about $350,000 in personal funds to get the project started.  [193:1-18]

60.     As a result of their concerns about ITC's conduct jeopardizing the agreements in place, on July 17, 2019, Berkowitz caused Rowley to file a voluntary Chapter 11 bankruptcy proceeding with this Court. [Volume 2 12:11-13:10]

61.     During this period of time, Berkowitz was aware of third parties that may be interested and able to purchase the project and get it sold, since it was apparent that ITC could not or would not pay what was due to be paid for the project.  [Volume 2 12:11-13:14]

62.     In response to the bankruptcy filing, ITC sought the dismissal of the bankruptcy case of Rowley by filing with this court a motion to dismiss the bankruptcy proceedings. ("Motion to Dismiss")

63.     ITC filed with this court the affidavit of Tom Wu in support of the Motion to Dismiss the bankruptcy case.  [Exhibit 26]

64.     Tom Wu understood that he was signing the affidavit under the pains and penalties of perjury, and understood that this meant that everything had to be true and correct.  [95:10-96:1]

65.     The Tom Wu affidavit [Exhibit 26] contained many false statements and misleading omissions, including the following:

a.   Wu claimed that a lease [Exhibit 26 – exhibit 4 thereto] was signed at the December 14, 2018 closing at the offices of ITC, and that the lease contained original signatures, including the signature of Barbara Berkowitz, which she personally signed at the closing. [96:2-9, Volume 2 64:14-65:5] In his affidavit filed with this court, Tom Wu did not state that the lease attached to his affidavit was not the lease that was originally signed at the closing.  [Exhibit 26, ¶¶12,

13]   In fact, the lease attached to Tom Wu's affidavit contains a typed signature of Barbara Berkowitz which is not her signature and is misspelled.  [198:7-25]

b.   Rather, during the second day of trial, Tom Wu claimed, for the first time, that the lease attached to his affidavit was given to Tom Beatrice in escrow and later emailed to him by Tom Beatrice in that form with Tom Wu's signature (original or electronic) and with Barbara Berkowitz's name misspelled.   [Volume 2 49:2-43:17, Volume 2 65:12-15]   However, Tom Wu did not explain how this was possible, either in his affidavit or in his direct testimony during trial.   He could not explain how Tom Beatrice could email him a lease with his original or electronic signature, but with the misspelled electronic signature of Barbara Berkowitz.   [Exhibit 26 ¶¶12, 13, 14] [Volume 2 66:24-68:10]   Tom Wu never produced an email from Tom Beatrice sending the lease to him as he described in his testimony. [Volume 2 68:8-18]

c.   His statements that there were repeated requests for documents from Berkowitz commencing after the closing date was inaccurate and misleading, as the first request for documents did not take place for 2 months after the closing date by email. [Exhibit 26 ¶¶16, 17] [100:1-12]

d.   His statements that agreements were signed in June 2019 to settle the Superior Court lawsuit prior to the bankruptcy filing were incomplete and misleading, in that ITC and Tom Wu did not disclose

the continuing issues of ITC's failure to pay sums to Berkowitz or to clean up the property of Maven. [Exhibit 26 ¶¶21-28] [91:15-94:20, 100:23-101:4]

e. Finally, Tom Wu claimed that the bankruptcy filing was causing an interruption to the daily earnings on the project of ITC due to the inability to sell electricity.  However, this was false, as the project had not yet received permission to operate from RMLP, which was required to sell electricity.  The failure of ITC to pay what was due to RMLP was, in part, the reason for the inability to get permission to operate.  [Exhibit 26 ¶31, exhibit 33] [22:3-23:12, 102:11-22]

66.     During the pendency of the Motion to Dismiss, the parties once again sought to resolve issues between them through negotiations. [102:23-103:12]

67.     Negotiations took place on various dates, but in earnest on September 5, 2019 at the offices of Riemer & Braunstein. (the "Meeting") [103:13-17, 151:17-19]

68.     During the Meeting, the parties had discussed proposals; ITC appeared by Tom Wu and an investor, Ara Barsoumian, with counsel.  [152:13-24] Berkowitz appeared with counsel and Rowley appeared with counsel, with Tom Wu saying Ara Barsoumian did not appear. [103:18-25]  However, one of the ITC investors, Ara Barsoumian, was also present. [152:13-24, 226:20-227:8]

69.     The parties discussed many issues at the Meeting, including:

a.  ITC proposed to allow them to continue with the project and to pay Berkowitz the $656,000 that was due under the MIPA. [155:6-9] This proposal was immediately rejected by Berkowitz. [228:1-9]

b.  Berkowitz advised that under no circumstances was ITC to ever be on the property of Maven again, which Tom Wu considered to be the "overarching" theme of the Meeting, which he understood and accepted. [105:10-21, 154:4-21]

c.  Based upon the no trespass order, it was negotiated with provisions that ITC would never set foot in the property again. [230:23-231:21]

d.  In addition to this, Tom Wu represented throughout that the project was mechanically ready to move forward, [156:5-24, 228:12-229:17] and that ITC was continuing to have damages to it as alleged in the Superior Court and in this Court. [228:12-229:17]

e.  After the economic parts of an agreement were resolved, Ara Barsoumian left the Meeting. [159:16-24]

f.  In reliance of the statements and promises made by ITC, through Tom Wu, Berkowitz agreed to the terms of an agreement. [230:23-231:21]

g.  In essence, the agreement reached provided that Berkowitz surrendered any right to payment of $656,000 from ITC in exchange for the permanent exclusion of ITC from the property of Maven. [230:23-231:21, Volume 2 75:25-76:2]

70.     On or before September 20, 2019, a Stipulation of Settlement ("Stipulation") was executed by Berkowitz, Rowley and ITC.  [Exhibit 14] [106:20-107:7, 160:18-25]

71.     The Stipulation was drafted primarily by counsel to ITC. [161:11-14]

72.     ITC and Berkowitz could not reach agreement as to the issue of soil removal on the property, and so Maven was not a party to the Stipulation. [Exhibit 14] [107:8-10, 231:22-232:9]

73.     The Stipulation prohibited ITC from being a bidder for the project, which was consistent with Tom Wu's understanding that ITC was never to be on the premises of Maven again.  [108:1-10]

74.     ITC knew that they were not to be on Maven's property again based upon a no trespass order issued and served on ITC in July 2019.  [Exhibit 25] [108:11-24]

75.     The Stipulation contemplated the sale of the assets owned by Rowley, [105:22-24] and after the execution of the Stipulation, Rowley proceeded with a sale process of those assets.

76.     The Stipulation provided for the manner in which the proceeds of the sale of the project would be divided.  These provisions provided an incentive for ITC to not be the eventual owner of the project, as this would result in a required payment from ITC to Berkowitz of $656,000.  [Exhibit 14 ¶5] [110:15-11:10, Volume 2 75:5-21]

77.     During the sale process, Tom Wu may or may not have discussed the amount of the bid or other terms with the stalking horse bidder, Soleps.  [109:3-110:1]

78.     Further, the Stipulation provided that if ITC was deemed the successful bidder, then in addition to paying Berkowitz $656,000, they would need to select a mutually acceptable management company for the project such that ITC would never appear at the project.  [Exhibit 14 ¶6] [111:11-20]

79.     The parties to the Stipulation were ITC, Rowley, and Berkowitz. Maven is not a party to the Stipulation.  [Exhibit 14, Exhibit 36] [111:21-112:5, Volume 2 76:21-80:12]

80.     During the sale process, certain bidders expressed concern to the counsel for Rowley about the data provided to them about the project, the fitness of the project, as well as other concerns. [162:10-163:7]  One of the parties to the sale process provided to Rowley's counsel, Alan Braunstein, a copy of the Mechanical Completion certificate signed by Volkin. [Exhibit 18 (second page only)] [165:6-166:9]

81.     Upon review of the Certificate, Alan Braunstein raised his concerns about the Certificate and the value of the project with counsel to ITC, as he was concerned about the integrity of the sale process. [166:12-167:5]

82.     After discussion, it was discussed that, if Alan Braunstein saw fit, he could call Volkin directly. [166:8-20]

83.     On or about November 16, 2019, Alan Braunstein communicated by telephone with Volkin.  [166:21-24]  He described the conversation with Volkin in open court on November 19, 2019. [168:13-169:23]

84.     Alan Braunstein advised the court about the conversation on November 19, 2019:[2]

---

[2]  This dialog is taken from the transcript of the hearing on November 19, 2019.

So I called Mr. Volkin and I asked Mr. Volkin, who was very cordial, very responsive, very considerate, and asked him if he had inspected the Rowley site. I specifically identified myself as an attorney for Rowley Solar and described the project and location. Mr. Volkin said he had never remembered ever having been to any site in Rowley and further stated that he had driven through the town but never remembered ever having stopped in the town.

I asked him, whether he remembered signing the certificate of inspection of mechanical completion and provided him the date. He said he had no recollection whatsoever.

He then offered to check his records. After doing so, he said it was not showing on any invoice which he took time to find with much courtesy. And I informed him of the date of February 20th, 2019. He then offered to check his diary calendar for February 20th, 2019. After a while, he said that on February 20th, 2019, the date of the certification, he was at 140 Wood Road in Braintree all day and could not have traveled to Rowley to conduct any inspection.

I then quoted from the document which he responded that he would not have performed that sort of work for a solar project. Specifically, he stated that his inspection involves nothing mechanical and does not opine on mechanical completeness. He added that he does not check anything, mechanical or not. He also said he would have had a copy, and he did not.

85.     After this revelation, ITC, through counsel, provided assurance that the project was mechanically complete, and did so inducing the high bidder to go forward for the full purchase price and for Maven to sign a new lease. [170:9-171:18, 234:14-25]

86.     Eventually, the sale went forward with PowerFund One ("PF"), with an escrow of $300,000 of ITC's funds to cover certain costs. [113:3-9, 170:9-171:18]

87.     After the sale, PF contacted ITC to perform services for the project. [Exhibit 27] [113:10-23, 171:25-172:3, 174:19-22]

88.     After the sale to PF, ITC and its employees went on to Maven's property without prior authorization from Maven. [236:1-18]

89.     PF extended efforts to get ITC on to Maven's property through repeated requests and threats to Maven:

    a.  PF was upset that ITC was thrown off the property, and threatened to play "Christian music" for the benefit of the neighbors to the project, Berkowitz.  [Exhibit 27] [173:5-174:16]

    b.  ITC, after receiving correspondence from PF to go on to Maven's property, communicated with Rowley's counsel seeking permission to go on to Maven's property.  [Exhibit 29] [176:18-177:2]

    c.  Alan Braunstein responded about his concerns regarding representations made by ITC during negotiations.  [Exhibit 31] [180:23-181:17]

    d.  In April, 2020, PF and ITC are still extending efforts to get ITC on to the project and the premises. [Exhibit 32] [182:4-17]

90.     Tom Wu admitted at trial that ITC went on the Maven's property at least 3 times after the sale from Rowley to PF. [Volume 2 59:6-21, Volume 2 76:6-10]  This was notwithstanding that ITC received consideration of $656,000 to stay away.  [Volume 2 75:25-76:5]

91.     Maven and Berkowitz attempted to allow ITC on the property one time under certain conditions, but neither PF nor ITC observed the conditions and left more trash at the property.  [Exhibit 28] [237:6-240:1]

92.     PF and ITC continued to communicate to get ITC on to the project. [Exhibit 30] [177:23-179:9]

93.     Counsel to ITC recognized that there was an understanding that ITC would not be on the project without the consent of Maven, even though ITC had already done so.  [Exhibit 32] [187:5-14]

## Conclusions of Fact

94.     ITC's verified statements to both the Superior Court and to this Court were knowingly false when made, were made with the intent to induce action of both Berkowitz and Maven, upon which both Maven and Berkowitz reasonably relied to their damage.

95.     ITC's statements within the Stipulation were knowingly false when made, were made with the intent to induce action of both Berkowitz and Maven, upon which both Maven and Berkowitz relied to their damage.

      a. ITC had an incentive to not be the successful bidder at the sale for the Debtor's assets.  ITC stood to save $656,000 by not being the successful bidder.

      b. ITC wanted to remain on Maven's property in an effort to recover all or as much of its $300,000 escrow as possible.

      c. ITC wrongfully entered upon Maven's property after the Stipulation and after the sale.

96.     The testimony of Tom Wu is not believable in light of his false testimony to his Court, as well as his numerous false statements contained in verified pleadings, as described above.  As a result, this Court is not satisfied that the relationship between ITC and PF was truthfully described by Tom Wu in his testimony which was that there is no continuing relationship between the two.

97.     Berkowitz, Rowley and ITC are the only parties to the Stipulation, as evidenced by the Stipulation itself and the Proof of Claim that ITC filed against Rowley.  [Exhibit 14]

98.     Berkowitz, in effect, paid ITC $656,000 to remain off of the property of Maven.

99.     ITC went on to the property of Maven after the date of the Stipulation and did so without permission.

100.    Maven is not a party to the Stipulation. [Exhibit 14]

101.    Further, the Stipulation is the product of the many misrepresentations by ITC and Tom Wu.  Even if Maven were a party to the Stipulation, it was the product of the misrepresentations of Wu and ITC.

102.    As a result, Berkowitz is not bound by the Stipulation.

103.    Even if Berkowitz or Maven were bound by the Stipulation, ITC breached the terms of the Stipulation by going on to the property of Maven after knowing that it was not to do so.

104.    Berkowitz is entitled, as a result of the breach, to retain their claims against Rowley, which in turn are to be paid by ITC as claims in this case.

105.    Maven is entitled, as a result of the breach and the misrepresentations of ITC, to retain its claims against Rowley, which in turn are to be paid by ITC as claims in this case.

106.   ITC used misrepresentations and economic pressure to induce Berkowitz into signing the Stipulation.

107.   The economic pressure imposed upon Berkowitz was as a result of the improper conduct of ITC.

<div style="margin-left:50%">

Respectfully submitted,

Bonni Berkowitz,
Barbara Berkowitz and
Maven Revocable Trust
By their attorney,
</div>

Dated: May 20, 2021                    /s/ Michael B. Feinman
                                       Michael B. Feinman
                                       BBO#545935
                                       Feinman Law Offices
                                       69 Park Street
                                       Andover, MA  01810
                                       Tel:  978-475-0080
                                       Fax: 978-475-0852
                                       Email: mbf@feinmanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Michael B. Feinman, hereby certify that I have this day served the foregoing pleading, by mailing a true and accurate copy of each, if not shown as being served electronically, via first class mail and postage prepaid, to the following parties in interest:

Alan L. Braunstein, Esq.
Email: abraunstein@riemerlaw.com

John G. Loughnane
Email: jloughnane@nutter.com

Joseph Toomey
Email: jtoomey@nutter.com

Dated:  May 20, 2021                     /s/ Michael B. Feinman
                                             Michael B. Feinman