# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# EASTERN DIVISION

| | |
|---|---|
| In re<br><br>ROWLEY SOLAR LLC,<br><br>     Debtor | Chapter 11<br>Case No. 19-12419-FJB |

## MEMORANDUM OF DECISION ON
## OBJECTIONS OF INVALEON TECHNOLOGIES TO CLAIMS OF BERKOWITZ PARTIES

This chapter 11 case is before the Court on the objections of Invaleon Technologies Corporation ("Invaleon") to proofs of claim filed by Bonni Berkowitz ("Bonnie"), Barbara Berkowitz ("Barbara," with Bonni, "the Berkowitzes"), and a realty trust of which the Berkowitzes are trustees, Maven Revocable Trust ("Maven") (collectively, "the Berkowitz Parties") on the basis that the claims have been released. Maven denies that it gave a release. The Berkowitzes contend that their releases were given as part of a settlement agreement that should be rescinded because Invaleon induced them to enter into it by fraud; and, in the alternative, they further contend that Invaleon should be compelled to pay their released claims as damages for breach of the settlement agreement. After an evidentiary hearing, the Court now enters the following findings of fact and rulings of law and, on the basis thereof, will sustain the objections to the Berkowitzes' claims but overrule the objection to the Maven claim.

**PROCEDURAL HISTORY**

Shortly after Rowley Solar LLC ("Rowley Solar" or "the Debtor") filed its petition for relief under chapter 11 of the Bankruptcy Code, commencing the bankruptcy case in which this proceeding arises, Invaleon moved to dismiss the case on the basis that the filing had not been duly authorized. The controversy was resolved by a settlement agreement among the Debtor, the Berkowitzes, and Invaleon (the "Settlement"), which, upon motion of the Debtor, the Court approved. The Settlement obligated

the Debtor to conduct a sale in bankruptcy of substantially all of its assets, provided for a distribution of the lion's share of the proceeds to Invaleon, and obligated Invaleon to satisfy from its proceeds all allowed claims in this bankruptcy case.

The Berkowitz Parties then filed the following proofs of claim, all unsecured and, except where otherwise indicted, nonpriority:[1]

| Claim | Claimant | Amount | Stated Basis |
|---|---|---|---|
| 8 | Maven | $320,400.00 | Estimated contingent liability for complying with permits. |
| 10 | Bonni | $575.00 | Cost of transcript obtained at request of debtor's counsel; priority asserted under § 507(a)(2). |
| 11 | Bonni | $50,000.00 | Provided Debtor funds to pay Debtor's prepetition retainer. |
| 12 | Barbara | $277,134.29 | Prepetition loan to Debtor. |

Invaleon filed an omnibus objection to certain claims in the case, including the Berkowitz Parties' claims. As to each of the Berkowitz Parties' claims, the basis of Invaleon's objection is that the claim has been settled, the Berkowitz Parties having agreed in the Settlement to accept $75,000 in full satisfaction of all claims against the Debtor, with any remaining such claims released. The Berkowitz Parties responded that, as to each of the four claims, the objection should be overruled because they were induced to enter the Settlement by fraudulent representations. Later, Maven further responded that it was not a party to the Settlement and so had given no release. After a further hearing, the Court ordered the claimants to identify with particularity the misrepresentations on which they rely, which they did by filing doc. #178, later amended in doc. #231. The Court then held an evidentiary hearing, at the beginning of which, for the first time, the Berkowitz Parties announced that they were also advancing a breach of contract theory: that Invaleon had breached its obligations under the Settlement, on account of which breach the Berkowitz Parties were entitled to damages in the amounts of their

---

[1] They also filed two other proofs of claim: No. 7, filed by Maven; and No. 9, filed by Bonni. Invaleon objected to those claims, too, and those objections have been finally resolved.

2

released claims. After trial, the Court received proposed findings and conclusions and heard closing arguments.

During closing arguments, the Berkowitz Parties moved to amend their responses to the objections to their claims by adding affirmative defenses of duress and judicial estoppel, saying that the evidence to support these theories had been admitted without objection. The Court denied that motion. Also during closing arguments, the Court asked the Berkowitz Parties to specify the misrepresentations that form the basis of their defense of fraud in the inducement. They specified only one: a false promise, allegedly made by Tom Wu for Invaleon as part of the Settlement, that Invaleon would never again set foot on the site of the solar array, the promise being false, the Berkowitz Parties contend, because Invaleon made it without intent to honor it.

**JURISDICTION AND AUTHORITY**

Subject to exceptions not applicable here, the bankruptcy jurisdiction of the districts courts extends to "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). An objection to claim arises not only in a bankruptcy case but under title 11 (the Bankruptcy Code), see 11 U.S.C. § 502(b) (authorizing court to adjudicate objections to claims), and it concerns and relates to the distribution of the assets of the estate. It therefore falls squarely in the bankruptcy jurisdiction conferred on the district courts by § 1334(b) and, pursuant to 28 U.S.C. § 157(a), referred by the district court for this district to the bankruptcy court for this district by a standing order of reference. Moreover, objections to claims are core proceedings within the meaning of § 157(b)(1) and (2). See 28 U.S.C. § 157(b)(2)(B) (core proceedings include allowance or disallowance of claims against the estate). Accordingly, the Court may hear and finally determine them. 28 U.S.C. § 157(b)(1).

**FINDINGS OF FACT**

1. Bonni and her mother, Barbara, reside together on property in Rowley, Massachusetts, that has been in their family for many years. In addition to serving as their home, the property is a working farm and includes acres of forested land that in recent years they decided to devote to the development of a solar farm. The portion of the property that is devoted to the solar farm is held in a realty trust, the Maven Revocable Trust, of which both Bonni and Barbara are trustees. No evidence has been adduced as to the identity of Maven's beneficiaries.

2. Development of the solar farm involved approximately ten years of effort by the Berkowitzes and investment of $350,000 to $500,000 of their own money before construction even began.

3. During these years, the Berkowitzes formed Rowley Solar LLC, a Delaware limited liability company whose members included Bonni and Barbara (it is unclear whether there are or have been other members), to own and manage the solar electricity generating business that they envisioned.

4. Rowley Solar then negotiated and put in place an interconnection agreement with Rowley Municipal Light Plant and a power purchase agreement with the same entity. Rowley Solar also secured the availability of certain valuable tax credits, contingent upon Rowley Solar's obtaining a certificate of mechanical completion of its solar array by February 21, 2019. Rowley Solar also obtained necessary permits for development of its solar farm, including from the Bureau of Resource Protections of the Massachusetts Department of Environmental Protection, which issued an "Order of Conditions" with which Rowley Solar was obligated to comply in the clearing of its land and installation of its solar array.

5. In late 2018, Rowley Solar began working with Invaleon, a solar electrical construction company. Invaleon takes solar power projects through their development and construction phases to operational readiness. Its chief executive officer is Tom Wu. Wu is the employee of Invaleon most familiar with the Rowley Solar project. At all relevant times he has had full authority to act on behalf of

4

Invaleon with respect to this project. Wu believed the Rowley Solar project would be attractive to investors because Rowley Solar had a power purchase agreement with a municipal authority.

6. Invaleon was first hired by Rowley Solar for the limited purpose of estimating the project's construction cost from plans that Bonni had provided. This estimate was needed to attract investors to the project. Invaleon completed this task and provided the estimate.

7. Next Rowley Solar asked Invaleon to help it get financing for the project in the form of an investor or perhaps a buyer. But by now, the project was running short on time. If "mechanical completion" were not achieved by February 19, 2019, Rowley Solar would lose the tax credits it had secured. Construction had not yet begun, and the work to be done—from clearing of the acreage through installation of the array—would require all the available time. They could not afford to delay the start of construction.

8. Instead of taking more time to obtain outside investment or financing, and in order to get construction started without delay, the Berkowitzes and Invaleon negotiated and entered into an agreement under which Invaleon would acquire Rowley Solar by purchasing its members' interests. Entitled the Membership Interest Purchase Agreement (MIPA), it was executed on December 14, 2018, with Wu signing on behalf of Invaleon and Bonni and Barbara signing on behalf of Rowley Solar.

9. The MIPA's terms included the following:
   a. The total purchase price was $949,640.00, which Invaleon was obligated to pay in three installments:
      i. $250,000 to the seller, plus $43,460 to the Town of Rowley Conservation Commission, payable upon "Closing," a defined term (not to be confused with the execution of the MIPA);
      ii. $328,000 to the seller, payable upon the Project's achieving mechanical completion as certified by the engineer of record; and

5

    iii. $328,000 to the seller, payable upon Rowley Solar's receiving permission to operate from the local distribution company.

b. If Invaleon failed to pay the final payment on or before its due date, Rowley Solar would have the right to repurchase the membership interests for one dollar, in which event all rights and title to the project and its related documents would be retransferred and delivered to Rowley Solar.

c. At the Closing, Invaleon was obligated to make the first of the three payments itemized above, and Rowley Solar, by and through Bonni and Barbara, its members, was obligated to execute an agreement that effected transfer of their membership interests to Invaleon.

d. The MIPA required that the Closing occur "on the date on which each of the conditions set forth in Sections 4.1 and 4.2 of the Agreement is satisfied, or on such date to which the Seller and the Buyer shall agree." MIPA, § 6.1. Sections 4.1 and 4.2 of the Agreement set forth the conditions precedent to obligations of the buyer (§ 4.1) and of the seller (§ 4.2).

e. Invaleon agreed to assume and be solely responsible for "all costs for the project from November 1, 2018 going forward for construction, engineering, legal and materials necessary to develop and operate the project." MIPA, § 3.13. Invaleon further agreed to assume and be solely responsible for "all costs for the project from the date of execution of this agreement going forward for all taxes, engineering and legal costs relating to the leased premises necessary to develop and operate the project." MIPA, § 3.13.

10. For reasons not explained, Invaleon and the Berkowitzes seem to have understood the first payment to be due upon the signing of the MIPA. Invaleon made the first payment shortly after the signing, not at or in conjunction with the Closing. No Closing ever occurred.

11. The MIPA is not also an agreement between Rowley Solar and Invaleon for the latter's construction and installation of the solar array. It is not clear whether these parties had a separate agreement for that purpose. In any event, both clearly understood Invaleon to be obligated to construct and install the solar array for Rowley Solar, and to do so in accordance with the MDEP's Order of Conditions and the various permits and agreements to which Rowley Solar was subject.

12. At some point, Invaleon and its subcontractors came onto Maven's property, cleared the land of trees and stumps, landscaped the property, and installed a solar array.

13. Rowley Solar and the Berkowitzes found Invaleon's work to be deficient in many ways, including among others: Invaleon failed to contain mud and rock to the work site, to the displeasure of (among others) the Berkowitzes' neighbors; it scheduled or permitted work after hours and on Sundays, in violation of permits; it permitted or tolerated workers' parking on the Berkowitzes' property; it used an uncovered dumpster (a covered dumpster was required); it allowed the dumpster to overflow and the construction site to be strewn with litter, construction debris, wires, pipe, and broken glass, all in violation of requirements; it removed trees that were outside of the scope of the permit; it destroyed corral fencing on the Berkowitzes' farm; it left big stumps that it was obligated to remove; it left a porta-potty on the site upside down. In addition, it became increasingly apparent that Invaleon, or its subcontractor, had removed—that is, stolen—from the work site many cubic yards of valuable topsoil. These were concerns to the Berkowitzes as neighbors to the project. They were also of concern to Maven as landlord of the solar farm site, because Maven would be liable for any failure to comply with permitting requirements and environmental conditions, and because the removed soil was a theft of its property having an estimated replacement value of $300,000.

7

14. Invaleon also suffered two mechanic's liens to be recorded against Maven's property by creditors of Invaleon. One of these was in favor of an entity known as Azad Legacy Partners, which had lent money to Invaleon in conjunction with the Rowley Solar project but had provided no services or materials for the project; in April 2019, Wu himself filed the documents for the Azad mechanic's lien.

15. In February, March, and April 2019, Invaleon, the Berkowitzes, and Rowley Solar, through their respective counsel, attempted without success to resolve their differences, with Invaleon asking for conveyance of the membership interests, and Rowley Solar and the Berkowitzes asking for evidence of mechanical completion and payment of the second payment under the MIPA.

16. On June 7, 2019, Invaleon filed a lengthy complaint in Massachusetts Superior Court against the Berkowitzes, seeking damages in excess of $20 million and an injunction requiring conveyance of their membership interests in Rowley Solar to Invaleon. The complaint was verified by Wu and included numerous averments that Bonni understood to be false.

17. Attorneys for the two sides worked out an extensive settlement, entitled simply "Agreement," the parties to which were Invaleon, Bonni, Barbara, Rowley Solar, and Maven. The Agreement obligated Invaleon to undertake some 15 measures to remediate the issues identified above with its construction efforts. The agreement also reserved Maven's rights with respect to the soil that Invaleon, or subcontractors working under its supervision, had, without permission, removed from the site.

18. Invaleon failed to perform many of the remedial measures that in the Agreement it had promised to undertake. In some respects, Invaleon made matters worse.

19. At this point, Bonni decided that Invaleon could not be trusted on the property or worked with any further. She took two steps.

20. First, on July 7, 2019, she caused Maven to serve a Notice of No Trespass on Invaleon, effectively prohibiting Invaleon from ever entering onto the site again, indefinitely.

21.  Second, she caused Rowley Solar to file a petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the case in which this proceeding arises. She viewed the bankruptcy case as a means for accomplishing multiple goals: preserving the value in Rowley Solar, preventing the rescission of permits that she and Barbara had secured at significant cost, preventing the cancellation of the interconnection agreement and power purchase agreement, obtaining payment for obligations of Rowley Solar that Invaleon had promised but failed to pay, and getting rid of Invaleon.

22.  Shortly after the bankruptcy filing, Invaleon filed a motion to dismiss the case on the basis that the filing had not been properly authorized.  Invaleon contended that under the MIPA, the membership interests had effectively been assigned to Invaleon, and therefore only Invaleon, and not the Berkowitzes, had authority to decide whether Rowley Solar should file for bankruptcy relief. After hearing on the motion, the Court took the matter under advisement, but the parties immediately entered into settlement negotiations.  The negotiations began after the hearing in the hallway of the courthouse and later continued in a day-long session with all the principals present on September 5, 2019.  The parties asked the Court to stay its determination of the motion for a time, to see whether the matter could be settled. The Court accordingly took no action on the motion for some time.

23.  The negotiations resulted in an agreement that the parties memorialized in a document entitled Stipulation of Settlement, which I have been referring to in this memorandum simply as the Settlement.  The parties to the Settlement are Rowley Solar, Invaleon, and Barbara and Bonni. Maven is not a party and not a signatory.  Barbara and Bonni signed in their capacity as individuals, not also as trustees of Maven.

24.  In the Settlement, the parties recite that they "desire to settle all disputes between them." "The parties therefore enter into this Stipulation in order to resolve such disputes[.]"

25.  The Settlement included the following terms:

9

a. The Debtor will sell in bankruptcy all or substantially all of its assets ("Purchased Assets").  The sale will be conducted in accordance with agreed-upon sale and bid procedures set forth in an appendix to the Stipulation.  At this stage, the Debtor had accepted a stalking horse bid in the amount of $4,125,000 from Solops Rowley, LLC.

b. Invaleon and affiliates of Invaleon are prohibited from bidding on the Purchased Assets or membership interests. Settlement, ¶ 1.

   i. However, if the successful bidder and any backup bidder fail to close, then Invaleon shall be deemed the successful bidder and authorized to close on specified terms for a purchase price including (a) payment of $650,000 to the Berkowitzes, (b) assumption of the Debtor's lease obligation to Maven, (c) assumption of payment of all allowed claims against the Debtor, (d) the applicable quarterly fees of the United States Trustee, and (e) the allowed administrative fees of the Debtor's professionals not to exceed $250,000.

   ii. In connection with an Invaleon purchase as described in the foregoing paragraph, the parties further agreed to "the employment and appointment of a mutually satisfactory third party manager such that neither [Invaleon] nor any of its employees shall be present or be required to be present on the premises." Settlement, § 6(a).

c. The proceeds of the sale shall be distributed as follows:

   i. $250,000 to the Debtor to satisfy in full the administrative professional fees and expenses of the Debtor;

   ii. $75,000 to the Berkowitzes "as full satisfaction of all claims against the Debtor and/or [Invaleon] held by them (with any remaining such claims released);

      provided however that all claims for past due and future rent to [Maven] shall survive and shall be paid by the Purchaser;"

  iii. the applicable United States Trustee quarterly fees from the amount allocated to and received by the Debtor;

  iv. $4,000,000 to Invaleon;

  v. $1,312,000 divided equally between Invaleon and the Berkowitzes; and

  vi. the balance to Invaleon.

d. From the proceeds payable to Invaleon, Invaleon shall fully satisfy all allowed claims in the bankruptcy case, "such that all construction liens, mechanics liens, threatened liens including liens arising under Mass. Gen. Laws Ann. 254 (West) recorded or sought to be asserted against the real property that includes the Project Site on account of such allowed claims shall be discharged and released and all lawsuits of any claimants relating to the Project Site, real property, and Berkowitzes be dismissed." Settlement, ¶ 3.

e. "In connection with, and subject to the closing of the sale, the parties shall exchange the mutual releases in the form attached hereto as Appendix B and take such action as is necessary to dismiss with prejudice all litigation between the parties." Settlement, ¶ 4.

f. Appendix B, entitled General Releases, states: "The Parties wish to release any and all claims that any Party may have against any other Party, and therefore enter into general releases as follows[.]" There follow two general releases (and only these two), one by Invaleon in favor of the Berkowitzes and the other by the Berkowitzes in favor of Invaleon.

26. Bonni and Barbara seek a finding that the terms of the Settlement included a requirement that Invaleon never set foot on the project site again and a promise by Invaleon never to set foot on the project site again. They bear the burden of proof on this issue and have not satisfied it. I make this finding for the following three reasons.

27. First, as is undisputed, no such term or promise appears in the writing that constitutes the Settlement. The Settlement did not include an integration clause, and therefore it is possible as a matter of law, that the term was agreed to but not included in the writing; however, the Settlement also required the approval of the Bankruptcy Court, and therefore this term and promise, had it been made, is one the parties would likely have seen fit to put in the writing that constituted the Settlement, of which approval was to be sought. The Berkowitzes contend that the failure to reduce this term and promise to writing was an oversight on the part of the drafting attorneys, but I have no testimony to that effect from any of the attorneys involved in the negotiation and drafting of the Stipulation. The Berkowitzes also contend that as to this term, Bankruptcy Court approval was not required because it ran between two parties—the Berkowitzes on the one hand and Invaleon on the other—who were neither the Debtor nor the estate. This theory fails because, although the term and promise involved two entities who were neither the Debtor nor the estate, it had an effect on the estate and the Debtor, as the present controversy demonstrates: for breach of this alleged term and promise, the Berkowitzes contend that Invaleon is obligated to pay from the sale proceeds their claims against the estate; that is, it bears upon and affects the price paid by Invaleon to the Debtor for estate assets. In addition, as might easily have been foreseen, the Berkowitzes would ask the Bankruptcy Court to enforce this alleged term if Invaleon breached it. Also, the Berkowitzes contend that this was not just one term among many but their overriding concern. I find by a preponderance of the evidence that, had this term been negotiated and agreed upon, it would have appeared in writing in the Settlement. That it did not is strong evidence that Invaleon never made this promise or agreed to this term.

28. Second, the Berkowitzes had no need for the prohibition and promise in question because they already had the no trespass order. The term in question would have been redundant.

29. Third, and must fundamentally, there is simply no evidence that Wu, for Invaleon, agreed to this term or made this promise orally or in any manner. No such term was ever negotiated or agreed upon. To be sure, Wu, for Invaleon, understood that the Berkowitzes strongly desired that Invaleon never come onto the project site again; the Berkowitzes made clear to Wu that this desire was a priority in their negotiation of the Settlement. This desire clearly did inform how they and Invaleon dealt with the contingency of Invaleon's becoming the owner of the project. But the parties never dealt with the possibility that a third-party might become the owner and desire that Invaleon come onto the project site to help with the third party's operation, maintenance, or completion of the project, such as for transitional issues, after the sale. Nor did they address the possibility that Invaleon might want or need to come onto the property for any other reason. They simply did not address these possibilities. The fact that the Berkowitzes had made their position clear does not mean that Invaleon accepted it for all contingencies that the parties did not address, much less that Wu made a promise to honor it.

30. For these reasons I find that Invaleon made no promise not to come onto the property and that the Settlement included no such term: not expressly in the written Settlement and not orally or otherwise outside of the written Settlement.

31. The Settlement, though not dated, was filed by the Debtor with a motion for its approval on September 20, 2019 (the "Motion to Approve Settlement"). Pursuant to the Settlement, the Debtor also filed a motion to authorize and approve its sale of all its assets to the stalking horse bidder, Solops Rowley, LLC, or the high bidder (the "Sale Motion"). After first approving certain procedures related to the Sale Motion, the Court scheduled both the Sale Motion and the Motion to Approve Settlement for hearing together on November 19, 2019.

32. On November 19, 2019, the Court heard and allowed the Motion to Approve Settlement and approved the Settlement.

33. On that same day, the Court also heard the Sale Motion. At the hearing, the stalking horse bidder decided not to bid further.  By then, the Debtor had received a higher bid from PowerFund 1, LLC ("PowerFund"), and the Debtor decided to proceed with a sale to PowerFund.

34. By order entered on November 26, 2019, the Court allowed the Sale Motion and thereby authorized the Debtor to sell all its assets to PowerFund. Eventually, the Debtor did sell its assets to PowerFund, and in conjunction with that sale, Maven negotiated and entered into a lease of the project site to PowerFund.

35. During the sale process, while counteroffers were still being solicited, Debtor's bankruptcy counsel, Alan Braunstein, learned of concerns from prospective bidders that the project was not complete. He also learned, after some investigation, that there was reason to believe that a certificate of mechanical completion that had been provided to Invaleon for the project may have been issued by the certifying engineer without his having conducted an actual inspection.  Mr. Braunstein placed these concerns on the record at the beginning of the hearing on the Sale Motion.  Notwithstanding these concerns, PowerFund elected to go forward with the purchase, but it first negotiated with Invaleon an agreement that $300,000 of the purchase price would be held in escrow to cover certain corrective repairs that might prove necessary to obtain necessary permits.  This escrow arrangement was incorporated into the order approving the sale.

36. Although there was considerable evidence that the engineer had in fact issued his certificate of mechanical completion without having performed the necessary inspection, the Berkowitz Parties have not established that the project was not mechanically complete, either when the certificate of mechanical completion was issued in February 2019 or during the succeeding months through the

sale of the Debtor's assets. The Debtor offered no testimony or other evidence of what precisely constituted mechanical completion, much less evidence that this had not been achieved.

37. At trial, Mr. Braunstein, who represented the Debtor in the negotiation of the Settlement, was asked whether Tom Wu, of Invaleon, had made representations to him that the project "was just ready to go, flick a switch." Mr. Braunstein replied "right," but did not indicate precisely what Wu had told him. Bonni testified that, during the negotiations, Mr. Braunstein relayed this information to her and her mother: "that the plant was all set, all ready to go, nothing was left to be done, the permits were fine, mechanical completion was all set." Wu denies having made these representations, but I credit the above testimony of Mr. Braunstein and Bonni and find that Wu did make these representations to Mr. Braunstein, knowing they would be relayed to the Berkowitzes, and that they were so relayed.

38. Bonni, however, did not testify that she relied on these representations in deciding to enter into the Settlement. (Barbara did not testify at all.) Nor did Bonni explain how such reliance might have been reasonable in light of the strong belief she had by then long held that Wu and Invaleon were not to be trusted in any respect. On the strength of evidence adduced by the Berkowitzes themselves, I find it highly unlikely that they would have relied on these or any representations by Wu in entering into the Settlement. The Berkowitzes have not proven that they in fact relied on these representations by Wu in entering into the Settlement.

39. Such evidence as was presented that the project was not complete was entirely in the form of hearsay: Mr. Braunstein repeating representations that he had received from representatives of prospective bidders. I do not credit these representations because the original declarants were not available for cross-examination; and in any event, the representations, especially as later related by Mr. Braunstein, are vague about the extent of the incompletion they allege. It is not even clear that the declarants, who are not identified, had first-hand knowledge of the extent of completion.

40. Almost as soon as the sale was completed, PowerFund asked Invaleon to perform services on the project site. The precise nature and extent of this assistance requested and given is not in evidence. What it included, beyond Invaleon's acquainting the new owner with the array and associated hardware it had installed, is simply impossible to determine from the evidence. Because it was subject to the no trespass order, Invaleon insisted on PowerFund's obtaining permission from Maven to enter on the property in order to provide this requested assistance. Maven initially resisted but ultimately gave permission for Invaleon to enter onto the premises, albeit with conditions. The extent of the permission given is unclear. Invaleon ultimately went on to the premises two or three times. At least one of these entrances was covered by the permission; it is not clear whether the permission extended to all two or three entrances.

41. The Berkowitz Parties also seek a finding that the true purchaser of the Debtor's assets was not PowerFund but Invaleon, and that Invaleon colluded with PowerFund to obtain the assets for Invaleon at a lesser cost than, under the Settlement, Invaleon would have had to pay had it purchased the assets in its own name. There is no evidence to support these proposed findings. On the evidence before me, PowerFund purchased the assets for itself. There is no evidence that Invaleon attempted to purchase the assets through PowerFund (or otherwise).

**DISCUSSION**

The matters before the Court are objections to claims. The burdens with respect to proofs of claim were summarized by Judge Somma:

> A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure constitutes prima facie evidence of the validity and amount of the claim. FED. R. BANKR. P. 3001(f); *see also Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir.1993). In order to rebut this prima facie evidence, the objecting party must produce "substantial evidence." *United States v. Clifford (In re Clifford)*, 255 B.R. 258, 262 (D. Mass.2000) (*Hemingway Transport*, 993 F.2d at 925). If the objecting party produces substantial evidence in opposition to the proof of claim and thereby rebuts the prima facie evidence, the burden shifts to the claimant to establish the validity of its

16

> claim. *Hemingway Transport*, 993 F.2d at 925 ("Once the trustee manages the initial burden of producing substantial evidence . . . the ultimate risk of nonpersuasion as to the allowability of the claim resides with the party asserting the claim.").

*In re Long*, 353 B.R. 1, at 13 (Bankr. D. Mass. 2006). The "substantial evidence" that the objecting party must produce in order to rebut the claim's prima facia validity is "evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Everett*, 2013 WL 3757283, at *5 (Bankr. D. Mass. July 15, 2013); *In re Alleghany International, Inc.*, 954 F.2d 167, 173-174 (3d Cir. 1991). This means that an "'objector must produce evidence equal in force to the prima facie case.'" *Tracey v. United States (In re Tracey)*, 394 B.R. 635, 639 (B.A.P. 1st Cir. 2008) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d at 173).

As to each basis of objection, the claimant's burden of establishing the validity of its claim is not one of starting from scratch. Rather, in view of the prima facie validity of the claim, the claimant's burden of ultimate persuasion (answering an objection supported by sufficient evidence) is a burden of persuasion only as to the particular objection, of establishing that the defect alleged in the objection either does not exist or is no defect.

    **a. Maven Realty Trust**

Invaleon has objected to each of the claims in issue on the basis that, through the Stipulation, the claim has been released. Though the Berkowitzes do not dispute that they released their claims, Maven responds that it was not a party to the Stipulation and gave no release through it. Invaleon has not replied to this response. I have found that Maven is correct as to the facts: Maven was not a party to the Stipulation. The Berkowitzes gave releases through the Stipulation, but Maven did not.

Maven's proof of claim No. 8 was filed in accordance with the Federal Rules of Bankruptcy Procedure and therefore enjoys prima facie validity.[2] Release is an affirmative defense; the burden of

---

[2] Invaleon does not contend otherwise.

proving it accordingly falls on the party asserting the defense, here Invaleon. Invaleon having failed to adduce evidence that Maven has released the claim it asserts in Proof of Claim No. 8, and Invaleon having failed even to adduce argument to support its contention that Maven has released this claim, I conclude that no release by Maven has been established. Invaleon's objection must accordingly be overruled as to Maven's Proof of Claim No. 8.

    **b. The Berkowitz Claims**

The Berkowitzes concede that through the Stipulation, they released their claims remaining in issue, Bonni's Proofs of Claim Nos. 10 and 11 and Barbara's Proof of Claim No. 12. As to each of these, however, the Berkowitzes contend that the Stipulation, including the releases given through it, should be rescinded for fraud in the inducement and given no effect; and, in the alternative, the Berkowitzes argue that Invaleon has breached the Stipulation and that, although the claims themselves have been released, Invaleon should be compelled to pay the amounts of their claims as damages for the breach. I will address these two defenses in turn.

    **i. Fraud in the Inducement**

The Berkowitzes' argument that the Stipulation, including especially their releases, should be rescinded for fraud in the inducement, is an affirmative defense. Accordingly, the burden is on the Berkowitzes to prove the fraud. The Stipulation was negotiated in Massachusetts among Massachusetts-based parties. The Court and parties are in agreement that it is governed by Massachusetts law. Under Massachusetts law, "[t]o establish fraud in the inducement, and thereby be relieved of the effect of" the Stipulation, the Berkowitz Parties must "establish the elements of common law deceit." *Commerce Bank & Trust Co. v. Hayeck*, 46 Mass. App. Ct. 687, 692 (1999). Those elements include "misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying." *Id*.

Though the Berkowitzes adduced a very lengthy statement of the misrepresentations that form the basis of their charge of fraud in the inducement, most of the alleged misrepresentations occurred before the negotiation of the Settlement. They had nothing to do with the Berkowitzes' decision to enter into the Stipulation, except that on the basis of them they had learned over and over again that Wu and Invaleon were not credible and were not to be trusted. During closing arguments, the Berkowitzes identified only one allegation of fraud on which they are relying: their allegation that they were induced to enter into the Settlement by a false promise by Wu, on behalf of Invaleon, that Invaleon would never again set foot on the project site. I have found that the Settlement included no such promise or agreement by Invaleon. Accordingly, this basis for fraudulent inducement comes to nothing.

Though they did not identify a second alleged misrepresentation during closing arguments, the Berkowitzes have repeatedly alleged a second misrepresentation: that during the negotiation of the Settlement, Wu represented that the project was mechanically complete and essentially ready to be turned on, that this was false, and that in reliance on this representation they agreed to the terms of the Settlement. I have found that the evidence fails to establish that the project was not mechanically complete or ready to be turned on when the Settlement was being negotiated. I have further found that the Berkowitzes have failed to establish that they relied on these representations in entering into the Settlement. For failure to establish that the alleged representation was false and that they relied on it, this basis for fraud in the inducement, too, comes to nothing. The Berkowitzes have accordingly failed to show fraud in the inducement.

  **ii. Breach of Promise Not to Enter**

In the alternative the Berkowitzes argue that Invaleon has breached the Stipulation, specifically its alleged requirement that Invaleon not ever enter onto the project site again, and that, although their claims have been released, Invaleon should be compelled to pay the amounts of the released claims as

19

damages for the breach. I have concluded that the Settlement included no term requiring that Invaleon never set foot on the property again. It follows that whatever offence may have been caused by Invaleon's coming onto the property at the request of PowerFund, that conduct was not a breach of the Settlement.

**CONCLUSION**

For the reasons stated above, the Court will, by separate order, overrule the Omnibus Objection as to Claim 8 of Maven Realty Trust and sustain the Omnibus Objection as to Claims 10 and 12 of Bonni Berkowitz and Claim 12 of Barbara Berkowitz.

Date:  April 18, 2022

_____
Frank J. Bailey
United States Bankruptcy Judge